(No. 43003.—

American Can Company, Appellee, *vs.* The Department of Revenue, Appellant.

*Opinion filed January 25, 1971.—Modified on denial of rehearing, March 31, 1971.*

Davis, J., took no part.

William J. Scott, Attorney General, of Springfield, (Francis T. Crowe, Morris S. Bromberg and Herman R. Tavins, Assistant Attorneys General, of counsel,) for appellant.

Arvey, Hodes & Mantynband, of Chicago, (Herman Smith, of counsel,) for appellee.

Mr. Justice Ward delivered the opinion of the court:

The defendant, the Department of Revenue of the State of Illinois (hereafter, the Department) has appealed from the judgment of the circuit court of Cook County which sustained the objection of the plaintiff, the American Can Company (hereafter, American) to an assessment by the Department under the Use Tax Act. (Ill. Rev. Stat. 1969, ch. 120, pars. 439.1 through 439.22.) The circuit court, acting on American's complaint for administrative review, held that the Department had improperly assessed American for certain "raw materials" which had been purchased outside the State of Illinois. Since a question of revenue is involved the Department has brought its appeal directly to this court. Ill. Rev. Stat. 1969, ch. 110A, par. 302(a).

The facts are not in dispute. American is a New Jersey corporation authorized to do business in Illinois. Its principal business is the manufacture and sale of containers for the packaging of food and other commodities. It operates

68 plants throughout the United States for the manufacture of containers, five of which plants are in Illinois. American manufactures also the machinery used to make the container-manufacturing machinery and replacement and repair parts for the container-manufacturing machinery. It appears that these plants are located in California, Ohio and New York. All of American's container-manufacturing machinery and replacement and repair parts are manufactured in these machine shops located outside of Illinois from raw materials purchased at retail by American outside of Illinois.

American receives all of the "raw materials" from its supplier at these out-of-state machine shops and transforms these materials into machinery and replacement and repair parts, which are later forwarded to American's container-manufacturing plants, including those in Illinois.

During the tax period concerned here, American purchased outside of Illinois $2,309,457.26 of this material on which it did not pay any sales or use tax in Illinois or elsewhere. This material was converted, at one or more of its machine shops, into machinery and replacement and repair parts and sent into Illinois for use at one or more of its Illinois container-manufacturing plants. The Department assessed a use tax against American, based on the value of the raw materials that had been purchased outside of Illinois and transformed into the machinery and replacement and repair parts which were introduced into Illinois for use by American. The Department's hearing officer in his findings described the "raw materials," saying: "The tax herein sought to be imposed is on the components, and other materials which were purchased by Taxpayer. It is perhaps misleading that the term 'raw Materials' is used herein. Taxpayer's machinery and replacement parts are made from steel or other alloy, bar metal and rough castings which Taxpayer purchases at retail. These materials are cut, welded, shaped and machined in Taxpayer's machine

shops and are then used for the fabrication of the machines and replacement and repair parts."

The Department argues that, under the Illinois Use Tax Act and under its rules, American is liable for use tax on materials which were ultimately used in Illinois. It says that since an Illinois manufacturer would be liable for use tax on materials incorporated into machines and parts in Illinois, it would give, contrary to the policy of the Use Tax Act, an undue advantage to an out-of-state manufacturer who incorporates materials into machinery out of the State for later use in Illinois if the latter were exempted from the tax.

The pertinent portions of the Illinois Use Tax Act and Rules of the Department provide: "§ 2. 'Use' means the exercise by any person of any right or power over tangible personal property incident to the ownership of that property, * * * 'Purchase at retail' means the acquisition of the ownership of or title to tangible personal property through a sale at retail. * * * 'Purchaser' means anyone who, through a sale at retail, acquires the ownership of tangible personal property for a valuable consideration." (Ill. Rev. Stat. 1969, ch. 120, par. 439.2.) § 3. "A tax is imposed upon the privilege of using in this State tangible personal property purchased at retail from a retailer. * * * To prevent actual or likely multistate taxation, the tax herein imposed shall not apply to the use of tangible property in this State under the following circumstances: * * * (c) the use, in this State, of tangible personal property which is acquired outside this State and caused to be brought into this State by a person who has already paid a tax in another State in respect to the sale, purchase or use of such property, to the extent of the amount of such tax so paid in such other State: * * * If the seller of tangible personal property for use would not be taxable under the Retailers' Occupation Tax Act despite all elements of the sale occurring in Illinois, then the tax imposed

by this Act shall not apply to the use of such tangible personal property in this State." (Ill. Rev. Stat. 1969, ch. 120, par. 439.3.) Rule No. 3: "The limitation in the Act to the effect that the tangible personal property must be purchased at retail from a retailer excludes, from the use tax, the use of tangible personal property produced by the user himself or acquired by the user by way of a gift or in some manner other than by means of a purchase. However, although the user is not taxable on the value of the finished product which he produces himself, such user is taxable on the purchase price of the tangible personal property that he purchases and incorporates into such finished product which he uses in this State, such purchase being a purchase at retail or a purchase for use." (Illinois Use Tax Rules—Rule No. 3—Department of Revenue.) It appears that except for variations not relevant here the statutes above were identical throughout the taxable period January 1960 through December 1966.

Opposing the Department's position, American points out that two requirements for the imposition of a use tax in Illinois are: (1) the property must have been purchased at retail, and (2) the property must have been used in Illinois. It acknowledges that the materials here were purchased at retail, but it contends that the materials were never used in Illinois. They were received by American outside of Illinois and there incorporated through manufacture into machines and replacement and repair parts. American says that in this process they lost their identity as raw materials and upon their introduction into the products manufactured outside of Illinois ceased to exist as such. American says, and, of course, this is not disputed by the Department, that the finished products were not purchased at retail as required by the Act to permit assessment of a tax. (See Ill. Rev. Stat. 1969, ch. 120, par. 439.3 and Rule No. 3—Illinois Use Tax Rules, Department of Revenue.) It is also argued by American that the imposition of a use

tax on the raw materials which were used in the manufacture of the products violates the due process clause of the Federal and State constitutions and imposes an unreasonable burden on interstate commerce.

As a question of ontology or being, the argument of American may have some abstract merit. The metals used by American changed form or identity in a sense when they were processed and shaped into machines and parts. However, physically they persisted as formed metal to be used by American and, viewing the purposes of the Use Tax Act, we consider that they were used by American in Illinois within the meaning of the statute. American purchased the materials at retail outside the State with the intention that the materials would be processed and then used by American in Illinois and other States. The out-of-state use of the materials by American was but a preliminary use to prepare them for use in Illinois and other States in manufactured form. Their principal and permanent use was intended to be and has been in Illinois and other States as machinery and parts. We do not mean by this to say that an intention of the taxpayer to use the property in this State is a *sine qua non* for the imposition of the use tax. We refer to American's intention here only to illustrate that the processing or use of the materials out of the State did not exhaust their use by American.

The Supreme Court of California in considering a question resembling this said in *Chicago Bridge & Iron Co.* v. *Johnson,* 19 Cal.2d 162, 119 P.2d 945, 948: "To say that in ascertaining whether the tax applies, one may not look through the fabrication or manufacture to the purchase of materials used in that process and conclude that such purchase was for storage or use in California, is to sacrifice substance for form. The true reason and purpose for purchasing the materials was not merely the fabrication thereof into tanks. Plaintiff did not intend to stop there. It purchased those materials for use and did use them in this

state." *Cf. Philco Corp.* v. *Department of Revenue,* 40 Ill.2d 312, and *Miller Brewing Co.* v. *Korshak,* 35 Ill.2d 86.

In *Turner* v. *Wright,* 11 Ill.2d 161, we discussed the intendment of the Use Tax Act and at page 166 said: "Use taxes were developed  *  *  *  to prevent evasion of the tax that applies when retail purchases are made within the State, and to protect the local retail merchant against diversion of his business to out-of-State sellers. Those are the purposes of the present tax. Such a protective tax can depend for its justification upon the tax that it supports. The principle is not new in our law.  *  *  *  A supplemental tax so levied to protect an admittedly valid tax from evasion or avoidance is clearly, in our opinion, a tax that is 'consistent with the principles of taxation fixed in this constitution'."

We judge that a holding that the materials here are used in Illinois and subject to the tax is consistent with the policy and intendment of the Use Tax Act to protect citizens of Illinois from having their business diverted to out-of-state sellers. To exempt American from the application of the use tax here would operate to discriminate against Illinois citizens who manufacture or assemble machinery or parts in this State. See *Turner* v. *Wright,* 11 Ill.2d 161, and *Philco Corp.* v. *Department of Revenue,* 40 Ill.2d 312.

American claims that the imposition of the use tax on the materials would violate the due process clause of both the Federal and State constitutions, for no attribute of ownership was exercised by it in Illinois with respect to the materials. We consider this to be basically a restatement of its metaphysical argument which we have here rejected. There is no question that the finished products were used in Illinois, and we consider that thereby the materials were used in Illinois by American.

It is also contended that the imposition of the use tax on these materials burdens and discriminates against interstate commerce. This contention is premised on the as-

sumption that the use of the materials outside of Illinois is what the Department seeks to tax. This is not the use that we consider taxable; rather it is the use of the materials as parts of or for products used in Illinois that is taxed. In *Philco Corp.* v. *Department of Revenue,* 40 Ill.2d 312, a similar argument was rejected when we upheld the imposition of the use tax on component parts of computers purchased outside of Illinois when the computers were subsequently leased and used in Illinois. We said at p. 322: "Philco's assertion that '[t]he leasing of the computer system in Pennsylvania for transport to and installation and use in Illinois was interstate commerce * * *' is immaterial, for the tax was not, as Philco erroneously assumes, imposed 'upon the act of Philco in leasing in Pennsylvania.' It was imposed on Philco's use of the computer in Illinois after Barber-Colman took possession, and Philco admits that the leasing of the computer system 'ceased to be interstate when possession was taken by Barber-Colman.'

" 'The tax is not upon the operations of interstate commerce but upon the privilege of use after commerce is at an end. Things acquired or transported in interstate commerce may be subjected to a property tax, non-discriminatory in its operation, when they have become part of the common mass of property within the state of destination. * * * For like reasons they may be subjected, when once they are at rest, to a non-discriminatory tax upon use or enjoyment.' *Henneford* v. *Silas Mason Co.* (1937), 300 U.S. 577, 582, 81 L. Ed. 814, 818."

The Supreme Court of California, in the case we have already referred to, *Chicago Bridge & Iron Co.* v. *Johnson,* 119 P.2d 945, 952, expressed a similar view: "The [use] tax as applied in the instant case does not discriminate against interstate commerce, or constitute a prohibited regulation or interference therewith. As we have seen it is complemental to the sales tax, and the two give a complete, uniform and equal coverage which, rather than dis-

criminating against interstate commerce, endeavors to place interstate commerce on a fair and equal basis therewith. The tax is not a regulation of interstate commerce although it may incidentally affect it. It is merely a tax on an event occurring in this state which does not burden interstate commerce nor place it at a disadvantage." (*Cf. Caterpillar Tractor Co.* v. *Department of Revenue, ante,* p. 278.) The application of the Use Tax here simply places an out-of-state manufacturer and an Illinois manufacturer on an equal footing where they both use their products in Illinois.

American has advanced cases in opposition to the Department's view. See, *Comptroller of the Treasury* v. *American Can Co.,* 208 Md. 203, 117 A. 2d 559; *International Business Machines Corp.* v. *David,* (Mo.), 408 S.W.2d 833; and *Commercial Leasing Inc.* v. *Johnson,* 160 Me. 32, 197 A. 2d 323.

In *Comptroller of the Treasury* v. *American,* the Court of Appeals of Maryland accepted the "ontological" argument which is advanced by American and held that materials purchased and used in a manufacturing process outside of Maryland were not subject to the Maryland use tax. It refused to follow the holding of the Supreme Court of California in *Chicago Bridge & Iron Co.* v. *Johnson,* 19 Cal.2d 162, 119 P.2d 945, which we have cited, saying: "We do not find the reasoning of the California Supreme Court persuasive. The decision relies heavily upon the loophole argument and brushes aside the change in the character of the finished product as a mere matter of form. We do not so regard it." (117 A. 2d 559, 561.) We judge, however, that the Supreme Court of California was more thoughtful in reaching its decision than one might conclude from this summary comment by the Maryland court. The California court was reasonable, we think, in the expressions we have cited here earlier and in the observation it made when addressing itself to the question: "In approaching this problem it is first necessary to consider the pur-

pose and object of the use tax. It cannot be doubted that the purpose sought to be accomplished by a statute relating to taxation is important in construing such statute and in determining the scope of its application. *City and County of San Francisco* v. *San Mateo County,* 17 Cal. 2d 814, 112 P.2d 595. One of these purposes is to make the coverage of the tax complete to the end that the retail sales tax (Stats. 1933, p. 2599) will not result in an unfair burden being placed upon the local retailer engaged solely in intrastate commerce as compared with the case where the property is purchased for use or storage in California and is used or stored in this State. The two taxes are complemental to each other with the aim of placing the local retailers and their out-of-state competitors on an equal footing." (119 P.2d 945.) We consider that the holding of the Supreme Court of California is to be preferred, especially when one looks to our precedents regarding the policy underlying the Illinois Use Tax Act. See *Philco Corp.* v. *Department of Revenue,* 40 Ill.2d 312; *Miller Brewing Company* v. *Korshak,* 35 Ill.2d 86; and *Turner* v. *Wright,* 11 Ill.2d 161.

The holding in *International Business Machines Corp.* v. *David,* 408 S.W.2d 833, is quite distinguishable. The Missouri Use Tax was to be imposed on "any article of tangible personal property." The court considering this statute, as well as other pertinent tax statutes, and holding that a different and higher tax on leased property would be imposed, said that the use tax did not apply to materials used in the construction of machinery. The court said: at page 836: "From all of these provisions, our view is that our use tax applies to the completed article (machine here) that is brought into this state and not the items of raw material that went into its manufacture, which, of course, are greatly changed in form and could not be identified as separate articles. Because the machines involved here were not purchased by plaintiff, but manufactured by it, they are not

subject to our use tax." Our use tax is not limited to "articles" of tangible personal property.

A reading of the opinion in *Commercial Leasing, Inc.* v. *Johnson,* 160 Me. 32, 197 A.2d 323, which does not squarely address itself to the question here, discloses that the courts in Maine have adopted a more narrow meaning of "use" than we have in Illinois. (See *Philco Corp.* v. *Department of Revenue,* 40 Ill.2d 312 and *Miller Brewing Company* v. *Korshak,* 35 Ill.2d 86.) We do not consider it has application here.

American contends that through error a duplicate assessment of the one we have considered here and, also, another and different assessment, which already had been satisfied, were included in the judgment of the circuit court. Accordingly, we reverse the judgment and remand the cause to the circuit court with directions to rectify the error in the original judgment.

*Reversed and remanded, with directions.*

Mr. JUSTICE DAVIS took no part in the consideration or decision of this case.