MORTON BUILDINGS, INC. *v.* TIMOTHY F. BANNON,
COMMISSIONER OF REVENUE SERVICES
(14398)

PETERS, C. J., GLASS, BORDEN, BERDON and F. X. HENNESSY, Js.

Argued March 26—decision released May 12, 1992

*Wesley W. Horton,* with whom were *Susan M. Cormier, Abraham M. Stanger,* pro hac vice, and, on the brief, *James E. Brandt,* pro hac vice, and *Scott F. Lewis,* for the appellant (plaintiff).

*Jonathon L. Ensign,* assistant attorney general, with whom, on the brief, was *Richard Blumenthal,* attorney general, for the appellee (defendant).

PETERS, C. J. The principal issue in this appeal is whether General Statutes § 12-411 (1)[1] imposes a use tax on raw materials that a building contractor has converted into building components outside of this state for incorporation into prefabricated buildings that it erects for its customers in this state. The plaintiff, Morton Buildings, Inc. (taxpayer), appealed to the trial court, pursuant to General Statutes § 12-422,[2] from a ruling of the defendant commissioner of revenue services (commissioner) that denied the taxpayer's claim for a refund of use taxes.[3] Relying on a stipulation of facts, the trial court determined that the taxpayer's appeal should be dismissed. The taxpayer sought review of this judgment in the Appellate Court, and we trans-

---

[1] General Statutes § 12-411 provides in relevant part: "THE USE TAX. (1) IMPOSITION AND RATE. An excise tax is hereby imposed on the storage, acceptance, consumption or any other use in this state of tangible personal property purchased from any retailer for storage, acceptance, consumption or any other use in this state . . . ."

[2] General Statutes § 12-422 provides in relevant part: "APPEAL. Any taxpayer aggrieved because of any order, decision, determination or disallowance of the commissioner of revenue services under section 12-418, 12-421 or 12-425 may, within one month after service upon the taxpayer of notice of such order, decision, determination or disallowance, take an appeal therefrom to the superior court for the judicial district of Hartford-New Britain, which shall be accompanied by a citation to the commissioner of revenue services to appear before said court. . . . Said court may grant such relief as may be equitable and, if such tax has been paid prior to the granting of such relief, may order the treasurer to pay the amount of such relief, with interest at the rate of nine per cent per annum, to the aggrieved taxpayer. If the appeal has been taken without probable cause, the court may tax double or triple costs, as the case demands; and, upon all such appeals which are denied, costs may be taxed against the appellant at the discretion of the court, but no costs shall be taxed against the state."

[3] The taxpayer's appeal challenges the denial of two requests for refunds of taxes paid and the validity of a deficiency assessment covering transactions from 1984 through 1987. The parties have stipulated that a final judicial determination of the validity of these claims will likewise dispose of similar claims relating to later periods not specifically included in this action. They have also stipulated that the taxpayer will be entitled to interest as allowed by statute in the event that the taxpayer's claims are held to have been justified.

ferred the appeal to this court pursuant to Practice Book § 4023. We reverse.

The stipulation reveals the following facts. The taxpayer is an Illinois corporation that is licensed to do business in Connecticut. In this state, the taxpayer assembles and installs prefabricated timber-frame, metal-sheathed warehouses and agricultural buildings at the customers' building sites. It markets its buildings directly to its customers, rather than retailing either buildings or building components through lumber yards or other retailers.[4]

The taxpayer purchases out-of-state, in bulk, almost all of the raw materials that are required for the construction of buildings in this state and elsewhere. The raw materials are stored in the taxpayer's out-of-state warehouses. When the taxpayer receives an order for a building, it delivers some of these raw materials to the work site in Connecticut without subjecting them to any further out-of-state production process. The taxpayer also delivers to the work site some windows, doors and hardware that it has bought in final form from other suppliers outside of Connecticut. With regard to these unaltered raw materials and supplies, the taxpayer concededly must pay, and has paid, Connecticut's use tax assessments.

Upon receipt of an order for the production and installation of a building in this state, the taxpayer,

---

[4] The trial court concluded that the transactions between the taxpayer and its Connecticut customers were contracts for the improvement of real property rather than contracts for the sale of tangible personal property. As a consequence, the transactions did not fall within General Statutes § 12-408, which imposes a sales and use tax on the contract price. The taxpayer must instead pay a tax on the materials used and consumed in fulfilling its contracts for the improvement of real property, a sales tax for materials purchased in Connecticut and a use tax for materials purchased at retail elsewhere. Neither party has challenged the validity of these conclusions.

however, also regularly converts other raw materials, such as sheets of lumber and rolls of steel, into building components and hardware components in accordance with the customer's specifications. The conversion process, which takes place entirely in factories located outside of Connecticut, results in the production of building components such as trusses, lower columns, upper columns, purlins, metal panels and overhang rafters. The taxpayer transports appropriately prefabricated building and hardware components to the job site in Connecticut, where they are incorporated into the assembly and erection of the customer's building.

The taxpayer maintains that it has no Connecticut use tax liability for raw materials once its out-of-state production process has transformed such materials into prefabricated building and hardware components. Such components, according to the taxpayer, are no longer "tangible personal property purchased from any retailer," as § 12-411 (1) requires. The commissioner maintains, to the contrary, that our use tax applies to any raw materials incorporated into a Connecticut building project regardless of the degree of transformation that such materials might have undergone prior to their entering Connecticut.

The trial court ruled in favor of the commissioner. It determined that the raw materials that the taxpayer had bought outside of Connecticut were not "so changed and transformed before they came into Connecticut as to preclude their being tangible personal property subject to the use tax. . . . [W]hat comes into Connecticut is steel and lumber in its original identifiable form for use in the construction of warehouses on customers' sites. As such it is tangible personal property subject to Connecticut's Use Tax."

The taxpayer's appeal raises two issues. Procedurally, does the trial court's determination that prefabricated production components come into Connecticut in their "original identifiable form" constitute a finding of fact or a conclusion of law? Substantively, does the taxpayer's production of prefabricated building components outside of Connecticut fall within the ambit of the Connecticut use tax as that tax is defined by § 12-411 (1)? We agree with the taxpayer that the trial court made a determination of law for which our review is plenary and that, on the merits, its appeal must be sustained.

I

The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record. Practice Book § 4061; *United Illuminating Co.* v. *Groppo,* 220 Conn. 749, 752, 601 A.2d 1005 (1992); *Zachs* v. *Groppo,* 207 Conn. 683, 689, 542 A.2d 1145 (1988); *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221–22, 435 A.2d 24 (1980).

In this case, the trial court's determinations were based on a record that consisted solely of a stipulation of facts, written briefs, and oral arguments by counsel. The trial court had no occasion to evaluate the credibility of witnesses or to assess the intent of the parties in light of additional evidence first presented at trial. The record before the trial court was, therefore, identical with the record before this court. In these circumstances, the legal inferences properly to be drawn from

the parties' definitive stipulation of facts raise questions of law rather than of fact. Cf. *Connecticut National Bank* v. *Douglas,* 221 Conn. 530, 545, 606 A.2d 684 (1992); *Bell Food Services, Inc.* v. *Sherbacow,* 217 Conn. 476, 482 n.7, 586 A.2d 1157 (1991); *Canaan National Bank* v. *Peters,* 217 Conn. 330, 335, 586 A.2d 562 (1991); *Mizla* v. *Depalo,* 183 Conn. 59, 63 n.8, 438 A.2d 820 (1981). Accordingly, our review of the ruling of the trial court in this case is plenary.

## II

The substantive issue that we must resolve is whether this taxpayer's use of building components fabricated outside of Connecticut falls within the terms of § 12-411 (1) that impose a tax on the "use in this state of tangible personal property purchased from any retailer for . . . use in this state." In our plenary review of the trial court's decision sustaining the commissioner's tax assessment, our point of departure is the oft-repeated principle that "when the issue is the imposition of a tax, rather than a claimed right to an exemption or a deduction, the governing authorities must be strictly construed against the commissioner and in favor of the taxpayer." *Hartford Parkview Associates Limited Partnership* v. *Groppo,* 211 Conn. 246, 249–50, 558 A.2d 993 (1989); *Zachs* v. *Groppo,* supra, 689; *Texaco Refining & Marketing Co.* v. *Commissioner,* 202 Conn. 583, 588, 522 A.2d 771 (1987); *Schlumberger Technology Corporation* v. *Dubno,* 202 Conn. 412, 420–23, 521 A.2d 569 (1987).

The parties agree with the trial court's analysis of § 12-411 (1) as requiring the establishment of three conditions for the imposition of the use tax. The commissioner must show that: (1) the allegedly taxable item was "tangible personal property" that was used in this state; (2) the "tangible personal property" was "purchased" from a "retailer"; and (3) the "tangible per-

sonal property" was purchased for "use in this state." With respect to the third of these conditions, General Statutes § 12-411 (13) provides: "It shall be presumed that tangible personal property shipped or brought to this state by the purchaser was purchased from a retailer for storage, use or other consumption in this state."

The taxpayer brings prefabricated building components into Connecticut for the purpose of installing these components into a building that it is constructing in this state. This activity involves the use of "tangible personal property" in Connecticut and establishes that the first condition contained in § 12-411 (1) has been met.

The disagreement between the parties focuses on the applicability of the second condition. The crucial issue is how to characterize the building components. The taxpayer contends that the fabrication of the building components has converted them into manufactured items that have acquired a new identity so as to remove them from the category of "tangible personal property purchased from any retailer for . . . use in this state." The commissioner contends, to the contrary, that the partial preassembly of lumber and steel into building components does not change the identity of the underlying raw materials for tax purposes and that these raw materials continue to fall within the basis for the use tax. In light of the stipulated facts, we agree with the taxpayer.

The stipulation of facts addresses the nature of the production process that takes place in the taxpayer's out-of-state factories. That process involves an integrated series of operations using the taxpayer's production machinery that not only cuts the raw materials to size but changes their shape and affixes metal

plates and other hardware.[5] We conclude, therefore, that the taxpayer's building components are not identical with the raw materials that go into their production.

The commissioner contends, for three reasons, that we should nonetheless view the raw materials used in the production of the building components as taxable pursuant to § 12-411 (1). He maintains that, in *International Business Machines Corporation* v. *Brown,* 167 Conn. 123, 130–32, 355 A.2d 236 (1974), we have already construed § 12-411 (1) to impose a use tax on component materials regardless of their change in form prior to their use in Connecticut. He urges us to adopt a liberal construction of the use tax in order to implement its salutary role as a backstop for the sales tax.

[5] For example, stipulation No. 22 provides: "To make the Trusses, the upper chords and lower chords that will form the Truss are run through a machine which cuts the chords to the proper lengths and to the proper angles at both ends of each chord. Lumber webbing, which is attached between the upper and lower chords, is also cut to length and to the correct angles. The Trusses (chords and webs) are then transferred to a fixture table where they are positioned 'face-up' and metal gusset plates, themselves made by Morton, are positioned at each joint. The gusset plates are then stitched into position with a pneumatic gun nailer. The Truss is then repositioned 'face-down' and additional metal gusset plates are positioned onto the joints on that side of the Truss. The Truss is then positioned onto a conveyor and transported through a roller press machine. The roller press machine imbeds the metal gusset plates into the wooden chords and webs at the pre-selected positions. The Trusses include end Trusses and intermediate Trusses."

As a further example, stipulation No. 26 provides: "To make the Metal Panels, Morton purchases coils of galvanized cold-rolled steel which are shipped to an independent contractor outside Connecticut for application of coatings to the steel. The rolled steel, with applied coatings, is then delivered to Morton's factories. When a factory receives an order, it makes the required interior and exterior Metal Panels by processing the rolled steel through a machine that rolls channels into the steel to add strength and then cuts the steel to specific lengths according to the requirements of the particular order. With the application of different paints and made in varying sizes, the Metal Panels are used for a variety of purposes including, inter alia, exterior sheeting, sidewalls and roof panels."

See *International Business Machines Corporation* v. *Brown*, supra, 129. Finally, he commends to us the guidance provided in his "Policy Statement 90-2, Modular Home Units"[6] and suggests that we should apply that policy, in conjunction with § 12-426-18 (b) of the Regulations of Connecticut State Agencies,[7] so as to place out-of-state builders of prefabricated buildings on the same footing as Connecticut builder-contractors.

[6] The Policy Statement provides in relevant part: "This policy statement is a restatement of the Department's existing policy and is issued in response to major changes in the prevalent business practices by out-of-state manufacturers in the modular home industry and sets forth the Department's Sales and Use Tax treatment of various methods of doing business within the industry.

"The prior business practice has been for the manufacturers to sell directly to the purchaser and to deliver, install and affix the modular units to the foundation either by its own employees or by a subcontractor under its direct supervision and control before the transfer of title took place. Under these circumstances, the Department has and will continue to treat the sale of the modular units as a construction contract for an improvement to real property. A Use Tax is due on the actual cost of the materials. In order for the manufacturer to be treated as a contractor, the actual placement of the modular home must be accomplished solely by employees of the manufacturer or a subcontractor under the direct supervision and control of the manufacturer. . . .

"Current business practices reflect a change whereby the manufacturer only delivers the modular unit to the building site and performs no connecting or finishing services although in some cases the unit may be off-loaded onto the foundation. Under these circumstances, the Department considers the manufacturers of modular home units to be making retail sales of tangible personal property when the manufacturer passes title to any buyer before the unit becomes affixed to the permanent foundation, and, accordingly, the full amount of the sales price is subject to Sales and Use Tax."

[7] Section 12-426-18 (b) of the Regulations of Connecticut State Agencies provides in relevant part: "TAXABILITY OF SALES TO OR BY CONSTRUCTION CONTRACTORS. A contractor shall pay the tax as a consumer on the purchase or lease of all materials, supplies or equipment used by him in fulfilling either a lump sum contract, a cost-plus contract, a time and material contract with an upset or guaranteed price which may not be exceeded, or any other kind of construction contract . . . ." The definitions included in subsection (a) of the regulation define only the terms "contractor" and "construction contract."

The linchpin of the commissioner's argument is his interpretation of *International Business Machines Corporation* v. *Brown, supra.* In that case, the issue presented, on a reservation arising out of stipulated facts, was "whether the use tax, levied upon an out-of-state manufacturing concern when its products enter the state for use, storage or consumption, should include within its ambit *the cost of labor performed upon component materials without the state,* or whether it should apply solely to the cost to the taxpayer of those component materials when originally purchased." (Emphasis added.) Id., 126–27. The court recognized that, by virtue of the broad definition of "sale" contained in General Statutes § 12-407 (2) (c), "if the subcontract work were performed in Connecticut the sales tax provisions would include the cost of this intermediary labor in its tax base." Id., 127. It noted, however, that the case before it was governed by the more limited definition of "purchase" contained in § 12-407 (7). Id., 128. Examining the history and the purpose of the sales and use tax, the court rejected the commissioner's suggestion to construe the language in the definition of "purchase" to achieve a result similar to that obtained in connection with the definition of "sale." Id., 134–35. The court acknowledged that the use tax had been designed "as a complementary measure [to the sales tax] to insure the equitable diffusion of the tax burden upon both in-state purchases of tangible personal property and out-of-state purchases of tangible personal property where such property is used, stored or consumed within the state . . . ." Id., 129. It noted, however, as earlier cases had held, that the two taxes "are different in conception, are assessments upon different transactions, and in the interlacings of the two legislative authorities within our federation may have to justify themselves on different constitutional grounds. A sales tax is a tax on the freedom of pur-

chase . . . . A use tax is a tax on the enjoyment of that which was purchased. *McLeod* v. *Dilworth Co.,* 322 U.S. 327, 330, 64 S. Ct. 1023, 88 L. Ed. 1304 [1944]. Whether or not the two shall have precisely the same scope is for the determination of the legislature. *Connecticut Light & Power Co.* v. *Walsh,* 134 Conn. 295, 300, 57 A.2d 128 [1948]." (Internal quotation marks omitted.) Id.

The holding of *International Business Machines Corporation* v. *Brown,* supra, does not govern the specific issue presented by this case. We agree with the taxpayer that the court therein merely assumed, but did not decide, that the use tax would apply "to the cost to the taxpayer of . . . component materials when originally purchased." Id., 127. Indeed, that taxpayer, relying on correspondence with the tax commissioner about the scope of the use tax; id., 131 n.3; had apparently stipulated that "the proper measure of the use tax base on its machines [was] the purchase price paid by IBM for component materials." Id., 126. To the extent that *International Business Machines Corporation* v. *Brown* has general relevance to the case before us, we note that the court rejected the commissioner's argument that a principle of liberal construction may be invoked to override the express language of the governing statute.

The commissioner finally asserts that his interpretation of § 12-411 (1) to include a taxpayer's raw materials in its use tax base is supported by the policy of the tax department as memorialized in its regulations and policy statements. We have often acknowledged our obligation to accord great weight to regulatory interpretations of long standing, especially when the applicable regulations have presumably gone through some form of legislative review. *Phelps Dodge Copper Products Co.* v. *Groppo,* 204 Conn. 122, 128–30, 527 A.2d 672 (1987); *Texaco Refining & Marketing Co.* v.

*Commissioner,* supra, 599–600; *Fusco-Amatruda Co.* v. *Tax Commissioner,* 168 Conn. 597, 605–608, 362 A.2d 847 (1975). We are, however, unpersuaded that the tax department's policy statements provide definite guidance in this case.

The commissioner's reliance on "Policy Statement 90-2, Modular Home Units" is problematic because that statement does not purport to describe how the use tax is measured. Its agenda, as the trial court noted, was to distinguish between the use tax liability of manufacturers of modular buildings who install and affix such buildings to real property and the sales tax liability of those who sell such buildings at retail prior to their affixation to a permanent foundation. With respect to the particulars of the use tax, the policy statement says only that "[a] Use Tax is due on the actual cost of the materials." The statement therefore does not purport to define the materials that are subject to the use tax.

The commissioner has a more plausible argument with respect to § 12-426-18 (b) of the Regulations of Connecticut State Agencies, which obligates a construction contractor to pay "the tax as a consumer on the purchase . . . of all materials, supplies or equipment used by him in fulfilling . . . a . . . construction contract." The commissioner construes this regulation as imposing a use tax on the cost of raw materials purchased and manufactured into a final item of tangible personal property out-of-state, when that item of tangible property is brought into the state for use.

The difficulty with the commissioner's contention is that the regulation does not say what he would have it say. The terms of the regulation do not distinguish between raw materials and manufactured materials. The regulation does not authorize collection of the use tax on traceable raw materials regardless of their transformation before they are used in this state. We agree

with the taxpayer, therefore, that the regulation does not illuminate the merits of the controversy that we must resolve. At best, the regulation mirrors the latent ambiguities contained in § 12-411 (1), and such ambiguities must be resolved against the commissioner when the issue is the imposition of a tax. *Hartford Parkview Associates Limited Partnership* v. *Groppo,* supra; *Zachs* v. *Groppo,* supra, 689; *Texaco Refining & Marketing Co.* v. *Commissioner,* supra, 588; *Schlumberger Technology Corporation* v. *Dubno,* supra.[8]

Our conclusion that this taxpayer need not pay a use tax based on its building components assembled outside of this state is consistent with the weight of authority in other jurisdictions. Construing statutes substantially similar to our own, the majority of courts have held that the conversion of raw materials into identifiably distinguishable personal property excludes the raw materials from continued taxability under the use tax. See, e.g., *Comptroller of Treasury* v. *American Can Co.,* 208 Md. 203, 208–209, 117 A.2d 559 (1955); *Morton Buildings, Inc.* v. *Commissioner of Revenue,* Minn. Tax Court, Docket No. 5385 (November 22, 1991); *International Business Machines Corporation* v. *David,* 408 S.W.2d 833, 836 (Mo. 1966); *Morton Buildings, Inc.* v. *Chu,* 126 App. Div. 2d 828, 830, 510 N.Y.S.2d 320, aff'd, 70 N.Y.2d 725, 513 N.E.2d 1304, 519 N.Y.S.2d 643 (1987); *Morton Buildings, Inc.* v. *Wisconsin Department of Revenue,* Wis. Tax Appeals Commission, Docket No. 89-S-438 (1991); contra *Chicago Bridge & Iron Co.* v. *Johnson,* 19 Cal. 2d 162, 167, 119 P.2d 945 (1941); *American Can Co.* v. *Department of Revenue,* 47 Ill. 2d 531, 536–37, 267 N.E.2d 657 (1971). We find the logic of these decisions persuasive.

[8] Because the issue before us concerns the imposition of a tax, we are unpersuaded of the relevance of regulations dealing with tax exemptions or exclusions. Section 12-426-11b of the Regulations of Connecticut State Agencies, which adds an administrative gloss on tax exemptions authorized by General Statutes § 12-412, therefore does not govern this case.

In light of our conclusion that the taxpayer's conversion of raw materials into identifiably different building components precludes the levy of the use tax on these raw materials, we need not consider the third condition imposed by § 12-411 (1). We therefore leave for another day the question of the circumstances under which an out-of-state building contractor that buys its raw materials in bulk can be held to have purchased such materials for use in this state.

The judgment is reversed and the case is remanded with direction to render judgment for the plaintiff.

In this opinion the other justices concurred.